IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERESA A. SEEMAN,                         )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )        Civil Action No. 12-498-GMS
                                          )
METROPOLITAN LIFE INSURANCE                )
COMPANY,                                  )
                                          )
          Defendant.                      )

## MEMORANDUM

## I.    INTRODUCTION

On April 19, 2012, the plaintiff, Teresa A. Seeman ("Seeman"), brought this action

against the defendant, Metropolitan Life Insurance Company ("MetLife"), the fiduciary and

administrator of the Bank of America Long-Term Disability Plan (the "Plan"), seeking the

payment of allegedly past-due benefits and a determination of her rights to ongoing benefits.[1]

(D.I. 1 at ¶ 14.) Presently before the court are the parties' March 19, 2013 cross-motions for

summary judgment (D.I. 16; D.I. 20). Both motions have been fully briefed, and, for the reasons

that follow, the court will deny MetLife's Motion for Summary Judgment (D.I. 16) and grant

Seeman's Motion for Summary Judgment (D.I. 20).

## II.   BACKGROUND[2]

---

[1] Seeman brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

[2] As discussed more thoroughly below, in resolving a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Conopco, Inc. v. United States*, 572 F.3d 162, 165 (3d Cir. 2009). While the parties clearly dispute the propriety of MetLife's benefits determination, there is substantial agreement as to the underlying facts.

The Plan is an employee welfare benefit plan governed by ERISA that provides long-term disability benefits ("LTD benefits") to qualified participants. (D.I. 1; D.I. 17 at 3.) MetLife served as both the fiduciary and claim administrator of the Plan. (D.I. 17 at 3; D.I. 18 at 11.) The Plan defines "disability" as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis unless, in the opinion of a Doctor, future or continued treatment would be of no benefit; and
> 1. During the first 24 months, excluding your Elimination Period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
> 2. After the first 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(D.I. 18 at 27.) The Plan, however, also imposes certain restrictions on eligibility for LTD benefits through the following "Limitation for Disability Due to Particular Conditions" provision:

> You are covered for 24 months of Disability, including Elimination Period(s), during your lifetime if you are Disabled due to a Mental or Nervous Disorder or Disease, unless the Disability results from:
> 1. Schizophrenia;
> 2. Bipolar disorder;
> 3. Dementia; or
> 4. Organic brain disease.
> "Mental or Nervous Disorder or Disease" means a medical condition of sufficient severity to meet the diagnostic criteria established in the current Diagnostic And Statistical Manual of Mental Disorders. You must be receiving Appropriate Care and Treatment for your condition by a mental health Doctor. In no event will Monthly Benefits be payable longer than the Maximum Benefit Duration shown in the Plan Highlights.

(*Id.* at 34.) Finally, the Plan provides that benefit payments end on the earliest of (1) the end of

the "Maximum Benefit Duration," (2) the end of the period set forth in the "Limitation for Disabilities Due to Particular Conditions" section or the "Limitation for Alcohol, Drug or Substance Abuse or Dependency" section, (3) the date on which the participant is no longer "disabled," as defined above, (4) the date on which the participant fails to provide information listed in the "Plan Highlights" section, (5) the date of the participant's death, or (6) the date on which the participant fails to attend a medical examination requested by MetLife. (*Id.* at 26.)

In 2007, Seeman was a First Vice President/Unit Manager II at Bank of America and a participant in the Plan. (*Id.* at 1; D.I. 21 at 3.) She was diagnosed with infectious mononucleosis in December 2007 with symptoms of fever, extreme fatigue, trouble breathing, flu-like symptoms, inability to concentrate, and inability to sleep. (D.I. 21 at 3.) Seeman submitted a claim for and received short-term disability benefits from December 5, 2007 until June 3, 2008. (*Id.*; D.I. 19 at 1671.) Seeman then applied for LTD benefits, and MetLife approved her application, making her eligible for LTD benefits effective June 4, 2008.[3] (D.I. 19 at 1530; D.I. 21 at 3.)

Seeman received LTD benefits from June 4, 2008 through July 16, 2010, when MetLife informed Seeman by letter that her benefits had been terminated. (D.I. 17 at 5; D.I. 19 at 998; D.I. 21 at 5.) MetLife's termination decision was based upon its review of Seeman's medical records and a Neuropsychological Testing Report prepared by Dr. Glen Greenberg (the

---

[3] MetLife indicates that Seeman "received LTD Plan benefits for the period from June 4, 2008 through July 16, 2010 based on claimed symptoms and impairments related to diagnoses of chronic fatigue syndrome, fibromyalgia, major depression, generalized anxiety disorder, and posttraumatic stress disorder." (D.I. 17 at 5.) Seeman, however, contends that "[t]here was no indication as to the specific diagnoses that [she] suffered from at the time of the LTD benefits approval." (D.I. 21 at 3.)

3

"Greenberg report"), following a June 11, 2010 independent medical examination.[4] (D.I. 19 at

1000.) In it July 16, 2010 termination letter, MetLife made the following observations regarding

the medical record:

(1) While Dr. James Berlin, Seeman's primary care physician, concluded that

Seeman was disabled, "there is no clinical evidence to support his assessment."

(*Id.* at 1000.)

(2) While Seeman treated with Dr. John Reinhardt, an infectious disease specialist,

for chronic fatigue, [tempromandibular joint disorder ("TMJ")], and fibromyalgia,

Dr. Reinhardt commented that he was unsure whether Seeman qualified for

disability. (*Id.*)

(3) Dr. Susan Epps, Seeman's psychologist, disgnosed her with "Major Depression

and Generalized Anxiety Disorder" and "Post-Traumatic Stress Disorder." (*Id.*)

(4) Dr. Monica Snowden, Seeman's rheumatologist, "indicated that [Seeman's]

diagnosis of fibromyalgia is a component of [her] medical condition, but is not

[her] primary health concern." (*Id.*) "Dr. Snowden also noted that [Seeman]

failed to respond to the drugs she has offered . . . and that she suspects [Seeman]

may have gotten to this point due to lack of sleep, depression and family stresses."

(*Id.*)

(5) Dr. Michael Carunchio, Seeman's neurologist, "noted memory loss and

recommended a brain MRI, which came back normal, along with a

---

[4] Dr. Greenberg, a psychologist board certified in psychology, clinical neuropsychology, and rehabilitation psychology, was hired by MetLife to perform the evaluation and issue the report. (D.I. 17 at 5; D.I. 19 at 1004–13; D.I. 21 at 5.)

4

neuropsychological exam." (*Id.* at 999.)

Additionally, MetLife noted that the Greenberg report diagnosed Seeman with "Undifferentiated Somatoform Disorder, Major Depressive Disorder, Single Episode, R/O Anxiety Disorder and Obsessive-Compulsive Personality traits." (*Id.* at 1000.) The termination letter proceeded to explain that "[s]omatoform disorders arise from psychological conflicts or issues that manifest and present with physical symptoms," and that "[t]hey can also arise with depression, which may be present, in [Seeman's] case." (*Id.* at 1001.) On this basis, the Greenberg report concluded that Seeman's "impairment exists due to psychiatric reasons and not neurological ones." (*Id.* at 1002.) MetLife's July 16, 2010 letter stated that the Greenberg report was "consistent" with the collective findings of Seeman's treating physicians, which revealed "an emphasis on psychological factors giving rise to or exacerbating the physical and cognitive complaints." (*Id.*)

Supposedly on the basis of the Greenberg report and the medical records, MetLife thus characterized Seeman's disability as resulting from a "Mental or Nervous Condition" under the "Limitation for Disability Due to Particular Conditions" provision rather than from any physical ailment. [5] (D.I. 17 at 5.) As indicated above, the Plan generally limits coverage for disability arising from mental health issues to twenty-four months.

Seeman then appealed MetLife's termination decision. (D.I. 19 at 946.) On appeal,

_____

[5] Specifically, the July 16, 2010 letter stated:

Based on the Nurse Consultant review of the available medical information on file, and of the [Greenberg report], the medical information in your file no longer substantiates an inability to perform the duties of your own or any occupation from a physical standpoint. Your complaints appear to have a psychological basis rather than a physical one.

(D.I. 19 at 1002.)

MetLife reviewed her file and the decision from the Administrative Law Judge (the "ALJ") of the Social Security Administration (the "SSA"), in which the SSA rejected Seeman's claim for Social Security Disability Income ("SSDI") benefits.[6] (*Id.*) MetLife also had three independent physical consultants (the "IPCs") review the record and issue separate reports. (*Id.*) Those reports were sent to Seeman's treating physicians, and each was invited to respond. (*Id.* at 9.) Some of Seeman's doctors did provide responsive letters, which MetLife then reviewed. (*Id.*) On June 17, 2011, MetLife informed Seeman that it had upheld its adverse determination on administrative appeal. (*Id.* at 12.) Specifically, MetLife explained:

> Ms. Seeman had diagnoses of fibroids, pelvic pain, vertigo, simple hyperplasia, menorrhagia, metrorrhagia, right ovarian cyst, chronic fatigue, fibromyalgia, neuropathy, hypertension, TMJ, mononucleosis, neuromuscular distrance, obsessive compulsive disorder, somatoform disorder, memory loss, pain disorder, congestion, sinus pressure, dizziness, ear fullness, histoplasmosis, eyelid erythema and allergies.

> The diagnoses of obsessive compulsive disorder, personality disorder, anxiety, post traumatic stress disorder, depression, organic CNS dementia, seasonal affective disorder, somatoform disorder and memory loss fell under the above limited disability benefits plan limitations. Ms. Seeman was not eligible for any benefits beyond the 24 months of disability, which is the maximum period payable under the plan. It was determined that there was no compelling evidence to support diagnoses of schizophrenia, bipolar disorder, organic brain syndrome, or dementia.

> Regarding Ms. Seeman's diagnoses of fibroids, pelvic pain, vertigo, simple hyperplasia, menorrhagia, metrorrhagia, right ovarian cyst, chronic fatigue, fibromyalgia, neuropathy, hypertension, TMJ, mononucleosis, neuromuscular distrance, pain disorder, congestion, sinus pressure, dizziness, ear fullness, histoplasmosis, eyelid erythema and allergies it was determined that the medical documentation on file did not support functional limitations beyond July 16, 2010.

---

[6] While the appeal denial letter did not actually mention the SSA opinion, (D.I. 18 at 295–304), both parties appear to acknowledge that the administrative decision was considered by MetLife, (D.I. 24 at 15–19; D.I. 29 at 8–10).

(D.I. 18 at 303.)

## III.    STANDARD OF REVIEW

### A. Summary Judgment Standard

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are material, and disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Conopco, Inc.*, 572 F.3d at 165; *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).    This standard remains the same where there are cross motions for summary judgment. *Lawrence v. City of Phila.*, 527 F.3d 299, 309 (3d Cir. 2008); *see also Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified . . . .").

### B. ERISA Standard

A plan participant or beneficiary is permitted by statute to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1332(a)(1)(B).

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where such discretionary authority is provided, the court reviews a benefits determination under an arbitrary and capricious standard. *See Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009); *Post v. Hartford Ins. Co.*, 501 F.3d 154, 160–62 (3d Cir. 2007); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir. 1997). The court asks whether there exists "sufficient evidence for a reasonable person to agree with the decision," *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000), seeking to determine if the plan administrator abused its discretion in reaching its conclusion, *see Fisher v. Aetna Life Ins. Co.*, 890 F. Supp. 2d 473, 480–81 (D. Del. 2012); *Malin v. Metropolitan Life Ins. Co.*, 845 F. Supp. 2d 606, 611–12 (D. Del. 2012).[7] Under this deferential standard of review, the court may overturn the administrator's decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffman–LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (citations omitted).

When the plan administrator is burdened by a conflict of interest, the court will include that conflict as one of the many considerations informing its review. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 116–117 (2008). The Supreme Court has made clear that such a conflict exists where "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own

---

[7] "The 'arbitrary and capricious standard' in a context such as this is essentially the same as an 'abuse of discretion standard.'" *Hitchens v. Washington Grp., Int'l, Inc.*,480 F. Supp. 2d 746, 752 (D. Del. 2007).

pocket." *Id.* at 108.

## IV.    DISCUSSION

There appears to be no dispute that the Plan provided MetLife with discretionary authority to interpret the Plan's provisions and make eligibility determinations. (D.I. 17 at 3 n.1; D.I. 18 at 47; D.I. 21 at 9.) As such, the court will apply the "arbitrary and capricious" standard of review discussed above.

Seeman makes four primary arguments in support of her position that MetLife abused its discretion in terminating her LTD benefits: (1) MetLife reversed its own 2008 conclusion that Seeman suffered from physical disorders without sufficient basis; (2) MetLife's decision was compromised by its conflict of interest; (3) MetLife largely disregarded the medical evidence that Seeman suffered from physical disorders; and (4) MetLife failed to give Seeman advance notice of termination and thus deprived her of an opportunity to seek additional medical pinions or rebut MetLife's relied-upon diagnoses. (D.I. 21 at 1–3.) The court addresses each of these contentions below.

### A.    Conflict of Interest

As noted above, a plain conflict of interest arises when an insurer such as MetLife assumes the dual role of reviewing and paying claims under a benefits plan. Such situations, however, are quite common, as "the 'lion's share of ERISA plan claims denials are made by administrators that both evaluate and pay claims." *Glenn*, 554 U.S. 105, 120 (Roberts, C.J., concurring in the judgment) (internal quotation marks omitted). It is well settled that the court need not give such a conflict dispositive weight or even alter its standard of review. *See Doroshow*, 574 F.3d at 233–34. Rather, the conflict functions as merely one factor considered in

9

the court's abuse of discretion analysis. *Id.* at 234. The Supreme Court has observed that:

> [A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117 (internal citations omitted).

Here, while both parties acknowledge the conflict, neither presents the court with particularized argument as to the weight it should accord this factor. (D.I. 17 at 14 n.9; D.I. 21 at 12.) As such, the court views the remaining considerations through the lens of this conflict, but does not grant it any special significance in the abuse of discretion analysis.

B. Reversal of Position

The Third Circuit has stated that "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 848 (3d Cir. 2011). Seeman argues that MetLife improperly terminated her LTD benefits despite the absence of any meaningful change in her medical condition. (D.I. 21 at 1–2.) MetLife responds simply that Seeman's assertions lack support in the administrative record and that her "medical records speak for themselves." (D.I. 25 at 2.)

The court cannot agree with Seeman on this point, as there was at least some new

10

medical information before MetLife at the time of termination. Of course, the court also understands the root of Seeman's concern—the primary "new" information before MetLife when it issued its July 16, 2010 letter was the Greenberg report. Dr. Greenberg, however, is a psychologist, not a medical doctor. While his report may have suggested that Seeman suffered from certain mental disorders, it could not directly present new information regarding her physical conditions.

The court, however, does not believe its inquiry can end there. Dr. Greenberg's diagnosis of undifferentiated somatoform disorder provided an alternative explanation for Seeman's physical symptoms, since "[s]omatoform disorders arise from psychological conflicts or issues that manifest and present with physical symptoms." (D.I. 19 at 1001.) His report thus may have warranted a reassessment of the preexisting medical evidence. Viewing old records through this new somatoform disorder lens, MetLife, in a sense, was presented with new medical information. Additionally, the court recognizes that, in April 2010, Dr. Fred Reinhardt, Seeman's infectious disease physician, confirmed Seeman's diagnoses of fibromyalgia, chronic fatigue syndrome, and TMJ but expressed some doubt as to whether she was eligible for disability. (D.I. 19 at 1073) This additional piece of new medical evidence was also before MetLife at the time of its initial termination decision. (D.I. 19 at 1000.)

Accordingly, this particular consideration is inapplicable here and does not counsel an abuse of discretion finding. However, as discussed below, the mere presence of new medical information does not mean that MetLife weighed it properly alongside the existing physician opinions and other medical evidence.

C.     Disregard for Physical Diagnoses

11

At the heart of Seeman's challenge is a complaint that MetLife failed to properly consider her various physical diagnoses in determining her continued eligibility for LTD benefits. While the Plan's coverage for disabilities arising from "Mental or Nervous Disorders" is limited to twenty-four months, no such restriction applies to disabilities arising from physical conditions. For the reasons that follow, the court agrees with Seeman on this point and finds it controlling as to its abuse of discretion inquiry.

               1. The July 16, 2010 Termination Letter

The court agrees with Seeman that the initial termination letter "was based almost entirely on Dr. Greenberg's opinion of a psychological disability while ignoring the numerous treating physicians that had indicated the presence of physical disabilities." (D.I. 21 at 16–17.) While MetLife referenced statements from the treating physicians concerning Seeman's mental health issues, it did not address the fact that each of these physicians—Dr. Berlin, Dr. Reinhardt, Dr. Epps, Dr. Snowden, Dr. Carunchio—reported that Seeman suffered from recognized physical conditions.[8] Here, MetLife made one of two potential mistakes—either it failed to account for the possibility that both Seeman's mental and physical conditions could independently give rise to a disability or it considered that possibility and simply discounted the physical diagnoses offered by Seeman's treating physicians. Given the letter's statement that "the medical

---

[8] In a December 21, 2010 Forensic Psychiatric Report, Dr. Neil Kaye summarized his evaluation of Seeman as well as his review of her medical records. (D.I. 18 at 593–94.) Dr. Kaye diagnosed Seeman with, *inter alia*, chronic fatigue syndrome, fibromyalgia, chronic fatigue immunodeficiency syndrome ("CFIDS"), and TMJ. (*Id.* at 595.) His report further noted that:

    ALL of [Seeman's] treating and consulting doctors (including but not limited to: Reinhardt – infectious disease; Berlin – family medicine; Epps – psychology; Carunchio – neurology; Snowden – rheumatology) have reached the same medical conclusions and diagnoses: fibromyalgia (FMS), chronic fatigue syndrome (CFS), temperomandibular joint dysfunction (TMJ) and depression. For such consistency to reign is reassuring and cements the medical nature of her organic illness.

(*Id.* at 593.)

information in your file no longer substantiates an inability to perform the duties of your own or any occupation from a physical standpoint," the court understands MetLife to have proceeded along the second route. (D.I. 19 at 10002.) The choice to discount these physical diagnoses, however, presents several problems.

As an initial matter, the court notes that "[a]n administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is . . . a cause for concern that suggests the decision may have been arbitrary and capricious." *Miller*, 632 F.3d at 853; *see also Kosiba v. Merck & Co.*, 384 F.3d 58, 68–69 (3d Cir. 2004). MetLife apparently takes the position that its termination letter, in fact, did address Seeman's physical diagnoses through its references to her various treating physicians and its concluding statement that "medical information in your file no longer substantiates an inability to perform the duties of your own or any occupation from a physical standpoint." (D.I. 25 at 8.) Such cursory treatment, however, does little to allay the court's concern regarding the reasonableness of MetLife's decision—paying lip service to a diagnosis is no less arbitrary than ignoring it entirely. *See Miller*, 632 F.3d at 854.

At best, the termination letter reflects an unfounded decision to discount the physical diagnoses of Seeman's doctors in contravention of the rule that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Here, the medical evidence drawn from the reports of the treating physicians suggested that Seeman was disabled as a result of certain physical conditions, including fibromyalgia and chronic fatigue syndrome, and it was MetLife's burden to demonstrate a factual basis for any conclusion to the

13

contrary.[9] *See Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2003) ("[O]nce a claimant makes a *prima facie* showing of disability through physicians' reports . . . and if the insurer wishes to call into question the scientific basis of those reports . . . then the burden will lie with the insurer to support the basis of its objection."); *Blakely v. WSMW Indus., Inc.*, No. 02-1631-SLR, 2004 WL 1739717, at *10 (D. Del. July 20, 2004). MetLife's initial termination decision, however, fails to satisfy this requirement.

For example, while MetLife justified discounting Dr. Berlin's reports by citing a lack of clinical evidence to support his assessments, it based its conclusions as to the absence of clinical evidence on the "test results" previously discussed in its termination letter. (D.I. 19 at 1000.) Those relied-upon test results were: (1) an MRI of the brain from which Dr. Carunchio was unable to determine whether Seeman suffered from a disturbance affecting the central nervous

---

[9] The reports suggesting a physical disability include: (1) a June 19, 2010 letter from Dr. Berlin reaffirming his earlier diagnoses of chronic fatigue syndrome, fibromyalgia, TMJ, and some level of depression, (D.I. 18 at 597); (2) an August 2, 2010 report from Dr. Carunchio based on a May 24, 2010 exam, diagnosing Seeman with, *inter alia*, chronic fatigue syndrome, fibromyalgia, TMJ, depression and hypertension, (D.I. 18 at 838–39); (3) a April 26, 2010 letter from Dr. Reinhardt to Dr. Berlin indicating diagnoses of chronic fatigue syndrome, fibromyalgia, and TMJ (but noting some uncertainty over whether Seeman would meet requirements for disability), (D.I. 18 at 682); (4) the December 21, 2010 report of Dr. Kaye diagnosing Seeman with, *inter alia*, chronic fatigue syndrome, fibromyalgia, CFIDS, and TMJ, (D.I. 18 at 594–95); and (5) the May 14, 2011 report of Dr. Diaz-Stanchi, an internal medicine specialist who became Seeman's primary care physician after Dr. Berlin left private practice, indicating impairment resulting from "debilitating fatigue of multifactor etiology," (D.I. 18 at 362). The court recognizes that not all these reports were prepared prior to MetLife's initial termination, but, for simplicity's sake, it chooses to note the later reports here as well. Several convey information about earlier reports/examination, and all are relevant to the court's below discussion of MetLife's decision on appeal. *See infra* Section IV.C.2. The court further notes that Seeman's *prima facie* case for physical disability is bolstered by the fact that MetLife based its initial grant of LTD benefits primarily on her fibromyalgia and chronic fatigue diagnoses. (D.I. 17 at 5; D.I. 19 at 998.)

MetLife might point out that it does not contest the scientific basis for the physical diagnoses but simply believes those diagnoses are not so severe as to be disabling. The court does not believe this distinction changes its analysis—the *Lasser* court stated that it is the insurer's burden to support its challenge to the basis of the physicians' reports (not just their medical diagnoses), and, where such reports indicate a claimant is disabled, the insurer must provide some evidence for its contrary conclusion. See *Lasser*, 344 F.3d at 391. Here, the Plan defines "disability" by reference to a claimant's ability to work and earn in occupations for which she is reasonably qualified, and Seeman's doctors have opined that her physical ailments prevent her from working. (D.I. 19 at 1200.) Dr. Diaz-Stanchi, for example, observed that Seeman had "debilitating fatigue of multifactorial etiology" and was "incapacitated such that disability and functional evaluation [could not] be performed." (D.I. 18 at 362.)

14

system and (2) an ENMG study of Seeman's right arm and leg, which found no evidence of an underlying polyneuropathy, entrapment neuropathy, radiculopathy, myopathy, or neuromuscular junction disorder. (*Id.* at 998–1000.)   Yet, as Seeman notes, chronic fatigue syndrome and fibromyalgia cannot be established via objective tests.  (D.I. 21 at 17.)   It thus appears that MetLife's decision to dismiss Dr. Berlin's diagnoses and disability findings lacked a proper foundation.[10]

The court recognizes that it is not an abuse of discretion for an insurer to weigh certain medical evidence more heavily than conflicting evidence.  *See Nord*, 538 U.S. at 834; *Fisher*, 890 F. Supp. 2d at 484.   Likewise, there is no requirement that an administrator grant special deference to the opinions of a claimant's treating physicians.  *See Nord*, 538 at U.S. 834. MetLife's July 16, 2010 termination decision, however, failed to accord any meaningful weight to the physical diagnoses and disability determinations offered by Seeman's doctors.[11]

2.  The June 17, 2011 Decision on Appeal

As noted above, MetLife's decision on appeal rested upon its conclusion that Seeman's "diagnoses of [mental conditions] fell under the . . . limited disability benefits plan limitations" and that her "diagnoses of [physical conditions] . . .  did not support functional limitations beyond July 16, 2010." (D.I. 18 at 303.)   In addition to Seeman's preexisting file, MetLife

---

[10] Moreover, it is an abuse of discretion for a plan administrator to demand objective tests establishing the existence of a condition for which there no such tests.  *See Fisher*, 890 F. Supp. 2d at 483.  Indeed, "[t]he Third Circuit has explicitly concluded that requiring objective medical evidence is arbitrary and capricious when a claim for long-term disability benefits is a result of chronic fatigue syndrome or fibromyalgia diagnoses."  *Id.* (citing *Steele v. Boeing Co.*, 225 F. App'x 71, 74–75 (3d Cir. 2007); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442–43 (3d Cir. 1997), *abrogated on other grounds by Glenn*, 554 U.S. at 112).

[11] The court further notes that the Greenberg report itself, upon which MetLife relied heavily, fails to provide contrary medical evidence as to Seeman's physical diagnoses.   Dr. Greenberg performed a neuropsychological test, (D.I. 17 at 5; D.I. 19 at 1004), but, such tests are not generally accepted tools in the diagnosis of chronic fatigue syndrome or fibromyalgia, (D.I. 19 at 895; D.I. 21 at 5 n.3).

reviewed various medical records submitted by Seeman, including the December 2010 forensic psychiatric report prepared by Dr. Kaye. (*Id.* at 296–97.) MetLife also hired three IPCs to review Seeman's records, meet with her physicians, and prepare written reports, which were then incorporated into its broader review.[12] (*Id.* at 298.) However, despite the seeming breadth of this evaluation, the court believes MetLife's decision on appeal also was arbitrary and capricious for reasons similar to those discussed above regarding the initial termination.

Neither the reports submitted by the occupational medicine IPC, Dr. Green, nor MetLife's summary of its findings in the June 17, 2011 decision letter adequately address the potential disability resulting from Seeman's physical conditions. Both the reports and the letter contain conclusory statements suggesting that her physical ailments were insufficient to support a disability finding. They fail, however, to explain the basis for these determinations or the reasons for seemingly discounting the opinions of Dr. Berlin, Dr. Carunchio, Dr. Reinhardt, Dr. Kaye, and Dr. Diaz-Stanchi, each of whom opined as to the physical nature of Seeman's disorders.

The initial Green report provided the following answer in response to the question of whether the medical information supported physical functional limitations:

No, the medical information does not support functional limitations beyond July 16, 2010. The reason I feel that Ms. Seeman is not functionally impaired is that her ability to function since 1982 going forward really has not changed. She has not been found to have an objective condition for which there is a physical sign or test that has been found to be abnormal over that nearly 30 year period . . . She has been inappropriately supported, particularly by Dr. Berlin. She also has been supported by Dr. Reinhardt, but it appears he comes at things somewhat more

---

[12] The IPCs were Dr. Russell Green (board certified in occupational medicine), Dr. John Shallcross (board certified in clinical psychology and neuropsychology), and Dr. Marcus Goldman (board certified in psychiatry and addiction psychiatry). (D.I. 17 at 7–8.)

16

> objectively. I disagree with his findings and his diagnosis, but he seems to have
> come at Ms. Seeman's problems in a more scientific and objective manner.

(D.I. 18 at 495.) The court notes at least two problems with this assessment. First, as discussed

above, "[t]he Third Circuit has explicitly concluded that requiring objective medical evidence is

arbitrary and capricious when a claim for long-term disability benefits is a result of chronic

fatigue syndrome or fibromyalgia diagnoses." *Fisher*, 890 F. Supp. 2d at 483 (citing *Steele*, 225

F. App'x at 74–75). Dr. Green apparently would require such objective indicia to find Ms.

Seeman disabled.

Additionally, while the Green report includes at least a brief discussion of its reasons for

disregarding Dr. Berlin's opinions and diagnoses, (D.I. 18 at 490), it provides no meaningful

explanation for discounting the physical diagnoses offered by several of Seeman's other treating

physicians.[13] As was the case with MetLife's initial termination letter, Dr. Green either entirely

failed to consider these relevant diagnoses or, at best, failed to provide a basis for his refusal to

credit them. Given MetLife's heavy reliance on the Green report in its decision on appeal,[14]

---

[13] The court has noted several of the physician opinions and reports diagnosing Seeman with physical ailments, including chronic fatigue syndrome, fibromyalgia, and TMJ. *See supra* note 9 (listing reports from Dr. Berlin, Dr. Carunchio, Dr. Reinhardt, Dr. Kaye, and Dr. Diaz-Stanchi). However, neither Dr. Green's initial report, (D.I. 18 at 488–97), nor his June 2, 2011 supplemental report, (D.I. 18 at 321–25), consider the physical diagnoses offered by Dr. Carunchio or Dr. Kaye. Further, the supplemental report only addresses Dr. Diaz-Stanchi's findings in passing, noting that "[t]he additional information offered by Dr. Diaz-Stanchi does not add useful clinical context to the problems of nearly [thirty] year worth of records." (D.I. 18 at 323.)

[14] The decision on appeal essentially consists of the following sections: (1) an explanation of the Plan's provisions, including the "Limitation for Disabilities Due to Particular Conditions" portion; (2) a general summary of the material MetLife reviewed and a statement of MetLife's finding that no LTD benefits were owed beyond June 3, 2010; (3) a more detailed overview of the correspondence between MetLife and Seeman and Seeman's additional medical submissions; (4) summaries of the three IPCs' investigations and findings; and (5) a statement of MetLife's conclusions. Disaggregated as such, it becomes clear that MetLife's ultimate conclusion that Seeman's "diagnoses of [physical conditions] . . . did not support functional limitations beyond July 16, 2010," (D.I. 18 at 303), was based largely on Dr. Green's findings. The two other IPCs—specialists in neuropsychology and psychiatry—focused their reviews on Seeman's *mental* disorders, (D.I. 18 at 477, 485), and, outside the IPC findings, the appeal decision letter disclosed no other new support for its conclusions. MetLife's own arguments from the present cross-motions further confirm the importance of Dr. Green's reports to its appeal decision. In its opposition brief, MetLife

17

these failures suggest that the review decision itself was arbitrary and capricious. *See Miller*, 632 F.3d at 853; *Nord*, 538 U.S. at 834.

D. Advance Notice of Termination

Seeman also complains that she was prejudiced by MetLife's failure to warn that it was considering termination of her benefits in advance of its July 16, 2010 decision letter. (D.I. 21 at 19.) She suggests that prior notice would have allowed her the opportunity to gather additional medical opinions and evidence, review the Greenberg report relied upon by MetLife, and generally attempt to refute MetLife's eligibility conclusions. (*Id.* at 19–20.)

The court, however, does not view the absence of advance warning as evidence that the benefits decision itself was arbitrary and capricious. Even if one assumes that constructive notice was not already provided by the Plan's 24-month limitation provision, Seeman cites no authority for the proposition that the failure to provide notice indicates an abuse of discretion. Additionally, Seeman's specific contention that the lack of warning prevented her from

---

provides a string citation in support of its contention that it properly considered the opinions of Seeman's treating physicians and adequately explained its basis for crediting other evidence over those opinions on appeal. (D.I. 25 at 7.) MetLife, however, cites only to the initial termination letter, the Greenberg report, the appeal decision, and the reports and supplemental reports of the three IPCs. The only new evidence on this list that might have provided a basis for overcoming Seeman's physical diagnoses are the Green reports.

The court recognizes that MetLife's appeal decision may also have drawn some support from the ALJ's opinion rejecting Seeman's claim for SSDI benefits. MetLife received the ALJ's decision on June 27, 2010, (D.I. 19 at 2072), and, while the appeal denial letter did not actually mention the SSA opinion, (D.I. 18 at 295–304), both parties seemingly acknowledge that the administrative ruling was considered by MetLife, (D.I. 24 at 15–19; D.I. 29 at 8–10). The court, however, does not believe the ALJ's opinion is sufficient to rescue MetLife's appeal determination. As an initial matter, while the consistency of a plan administrator's decision with an SSDI finding can function as one factor in the abuse of discretion analysis, it certainly is not dispositive. *See Russell v. Paul Revere Life Ins. Co.*, 148 F. Supp. 2d 392, 409 (D. Del. 2001); *see also Edgerton v. CNA Ins. Co.*, 215 F. Supp. 2d 541, 549 (E.D. Pa. 2002). Not only are different standards applicable in each context, *see Nord*, 538 U.S. at 832–33, but the plan administrator may be aware of facts unavailable to the ALJ, *see Goletz v. Prudential Ins. Co. of Am.*, 383 F. App'x 193, 198 (3d Cir. 2010). Here, for example, Dr. Kaye's report was prepared several months after the ALJ issued his opinion. (D.I. 18 at 586; D.I. 19 at 2072.) For these reasons, even assuming for the purposes of this summary judgment motion that MetLife did rely, in part, on the ALJ determination, the court cannot conclude that this lone administrative ruling outweighs the numerous indications of MetLife's arbitrary and capricious decision making.

18

adequately refuting MetLife's eligibility determination is belied by the fact that she presented additional evidence and arguments on appeal.

E. Appropriate Remedy

Viewing the facts in the light most favorable to MetLife, the court finds that, while MetLife did not abuse its discretion in determining that Seeman had significant mental health issues or even that her mental disorders were her most severe medical problems, it was arbitrary and capricious in deciding that her remaining physical diagnoses did not independently render her disabled. On a broad level, the court simply cannot locate "sufficient evidence for a reasonable person to agree with [MetLife's] decision," in either the Greenberg report (which focused on Seeman's mental condition), the three IPC reports (two of which focused on Seeman's mental condition), or MetLife's cherry-picked fragments of Seeman's medical records. *Bert Bell NFL Player Ret. Plan*, 214 F.3d at 142. More specific problems include: (1) Dr. Green's demand for objective evidence of physical impairments and MetLife's discounting of Dr. Berlin's opinion due to his failure to perform objective tests; (2) the failure to consider all Seeman's relevant physical diagnoses; and (3) to the extent physical diagnoses were considered, MetLife's failure to offer an adequate basis for discounting certain physician opinions.

Upon finding that a plan administrator's benefits decision was arbitrary and capricious, the court has discretion to fashion an appropriate remedy. *See Carney v. Int'l Bhd. of Elec. Workers Local Union 98 Pension Fund*, 66 F. App'x 381, 386 (3d Cir. 2003); *Fisher*, 890 F. Supp. 2d at 485–86. In *Miller v. Am. Airlines, Inc.*, 632 F.3d 837 (3d Cir. 2011), the Third Circuit noted that:

> [i]n deciding whether to remand to the plan administrator or reinstate benefits . . .
> it is important to consider the status quo prior to the unlawful denial or

19

> termination. As such, an important distinction emerges between an initial denial
> of benefits and a termination of benefits after they were already awarded. In a
> situation where benefits are improperly denied at the outset, it is appropriate to
> remand to the administrator for full consideration of whether the claimant is
> disabled. To restore the status quo, the claimant would be entitled to have the plan
> administrator reevaluate the case using reasonable discretion. In the termination
> context, however, a finding that a decision was arbitrary and capricious means
> that the administrator terminated the claimant's benefits unlawfully. Accordingly,
> benefits should be reinstated to restore the status quo.

*Id.* at 856–57 (internal citation omitted).

While the court recognizes that *Miller* ordinarily would counsel reinstatement of benefits
in a case such as this, where the plan administrator abused its discretion to terminate ongoing
payments, it notes that MetLife's July 16, 2010 termination decision occurred at the end of the
initial 24-month LTD coverage period under the Plan. As discussed above, the Plan sets forth
one disability standard applicable to the first 24-month claim period and another more stringent
standard that attaches thereafter.[15]   Though MetLife certainly terminated Seeman's ongoing
benefits in July 2010 and acted arbitrarily and capriciously in doing so, the court is not prepared
to reinstate those benefits at this time, as it is not in a position to conclude whether Seeman's
physical diagnoses rendered her "disabled" under the heightened post-June 3, 2010 standard.

Indeed, even absent this shift in the Plan's disability standard, the court has some doubt

---

[15] Specifically, the Plan provides:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are
receiving Appropriate Care and Treatment from a Doctor on a continuing basis unless, in the
opinion of a Doctor, future or continued treatment would be of no benefit; and

1. During the first 24 months, excluding your Elimination Period, you are unable to earn more
than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own
Occupation for any employer in your Local Economy; or

2. After the first 24 month period, you are unable to earn more than 60% of your Indexed
Predisability Earnings from any employer in your Local Economy at any gainful occupation for
which you are reasonably qualified taking into account your training, education, experience and
Predisability Earnings.

(D.I. 18 at 27.)

20

that it could simply reinstate Seeman's LTD benefits. For the reasons provided in detail above, the court recognizes that MetLife's termination decision was arbitrary and capricious, and this conclusion entitles Seeman to summary judgment in light of MetLife's responsibility to render benefit decisions with reasonable discretion. It does not necessarily follow, however, that Seeman's physical diagnoses, taken alone, resulted in a "disability," even under the pre-June 4, 2010 standard.[16] Seeman points to various indications of physical impairments including the medical opinions of her treating physicians, but her evidence that these impairments actually resulted in disability is limited, consisting primarily of Dr. Diaz-Stanchi's report that Seeman had "debilitating fatigue of multifactorial etiology" and was "incapacitated such that disability and functional evaluation [could not] be performed." (D.I. 18 at 362.)

    In sum, though MetLife's termination decision was improper, it was not necessarily incorrect—to determine its accuracy, more information is required about how Seeman's physical diagnoses affected her earning capacity. The court thus will remand for MetLife to evaluate whether Seeman remained disabled under the post-June 3, 2010 disability standard consistent with the guidance provided throughout this Memorandum and its duty to exercise reasonable discretion in reviewing benefit claims.[17]

---

[16] As previously noted, there is some dispute regarding the very basis for MetLife's initial grant of LTD benefits. *See supra* note 3. MetLife appears to suggest that Seeman's disability resulted from a combination of physical and mental issues, noting that she "received LTD Plan benefits for the period from June 4, 2008 through July 16, 2010 based on claimed symptoms and impairments related to diagnoses of chronic fatigue syndrome, fibromyalgia, major depression, generalized anxiety disorder, and posttraumatic stress disorder." (D.I. 17 at 5.) On the other hand, Seeman contends that "[t]here was no indication as to the specific diagnoses that [she] suffered from at the time of the LTD benefits approval." (D.I. 21 at 3.) Significantly, under either view, there is a lack of certainty as to whether Seeman's physical impairments alone rendered her disabled per the terms of the Plan.

[17] Again, the court does not suggest that MetLife must find Seeman disabled. As the court has previously noted in the ERISA context, it is "not beyond the realm of reality" for a plan administrator's initial benefits decision to be arbitrary and capricious and a subsequent decision to be proper even when it arrives at the same result. *Sanderson v. Cont'l Cas. Corp.*, 279 F. Supp. 2d 466, 478 (D. Del. 2003).

## V. CONCLUSION

For the foregoing reasons, the court will deny MetLife's Motion for Summary Judgment (D.I. 16), grant Seeman's Motion for Summary Judgment (D.I. 20), and order that this case be remanded to MetLife for further proceedings consistent with this Memorandum.

Dated: July 30, 2013

_____
CHIEF, UNITED STATES DISTRICT JUDGE

22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TERESA A. SEEMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No.  12-498-GMS |
| | ) |
| METROPOLITAN LIFE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## ORDER

At Wilmington this 30th day of July 2013, consistent with the memorandum opinion issued this same date, IT IS HEREBY ORDERED THAT:

1. The defendant's Motion for Summary Judgment (D.I. 16) is DENIED;

2. The plaintiff's Motion for Summary Judgment (D.I. 20) is GRANTED; and

3. This matter is remanded to the defendant, the administrator of the Bank of America Long-Term Disability Plan, to take further action consistent with the court's memorandum opinion.

CHIEF, UNITED STATES DISTRICT JUDGE