IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TERESA A. SEEMAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> METROPOLITAN LIFE INSURANCE ) <br> COMPANY, ) <br> ) <br> Defendant. ) | Civil Action No. 1:12-CV-498-GMS |

**MEMORANDUM**

## I. INTRODUCTION

On April 19, 2012, Plaintiff Teresa A. Seeman ("Seeman") brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq* against the Defendant, Metropolitan Life Insurance Company ("MetLife"), the fiduciary and administrator of the Bank of America Long Term Disability Plan (the "Plan"), seeking the payment of allegedly past-due benefits and a determination of her rights to ongoing benefits. (D.I. 1 at ¶ 14.) On July 30, 2013, the court signed a Memorandum and Order denying MetLife's previous Motion for Summary Judgment and granting Seeman's cross-motion for Summary Judgment. (D.I. 32.) In that Memorandum, the court indicated that it needed more information "about how Seeman's physical diagnoses affected her earning capacity" and remanded the case to MetLife for further proceedings consistent with the Memorandum. (D.I. 32 at 21.) On October 12, 2016, the court reopened the case and the parties filed a Joint Status Report on October 26, 2016. (D.I. 46.) Presently before the court is Seeman's Motion for Summary Judgment (D.I. 55) and MetLife's Cross-Motion for Summary Judgment. (D.I. 59.)

1

## II. BACKGROUND

The court provided an overview of the case in its previous Memorandum, thus, the court will only provide the facts necessary to decide the present motions. (D.I. 32.) Seeman asks the court to hold MetLife's final claim determination finding her ineligible for continuing long term disability ("LTD") benefits was arbitrary and capricious because they did not meet their burden of proving she is not disabled, as defined by the Plan. The Plan is an employee welfare benefit plan as defined and governed by ERISA. 29 U.S.C. § 1001, *et. seq.* MetLife is the claim administrator for the Plan and funds the LTD benefits.

From May 14, 1990 until December 4, 2007, Seeman worked for Bank of America as a Vice President, Unit Manager. (D.I. 57 at 2.) During Seeman's final year of employment, her salary was $111,280.00 per year. *Id.* On June 4, 2008, MetLife began paying monthly benefits to Seeman after she was unable to return to work following diagnoses of Chronic Fatigue Syndrome ("CFS") and Fibromyalgia ("FMS"). (D.I. 1, ¶ 6); (D.I. 57 at 2.) On December 7, 2007 Seeman claimed disability from her position at Bank of America and received LTD benefits through July 16, 2010 until MetLife terminated them. (D.I. 17 at 5.) After two years of providing Seeman benefits, the definition for "disability" under the Plan changed. (D.I. 57 at 2.) Under the Plan,

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a doctor on a continuing basis unless, in the opinion of the Doctor, future and continued treatment would be of no benefit; and
> 1. During the first 24 months, excluding your Elimination Period, you are unable to earn more than 80% of your Predictability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
> 2. After the first 24 month period, you are *able to earn more* than 60% of your Index Predisability Earnings from any employer in your local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

2

(D.I. 18 at 27-28.) Following the initial termination, Seeman appealed and the presiding Administrative Law Judge ("ALJ") concluded that Seeman's "own testimony [wa]s inconsistent with the disabling level of physical or mental impairments." (D.I. 60 at 5.) At that time, MetLife provided Seeman with the opportunity to submit additional documentation in support of her claim, which she did. (D.I. 60 at 6.) On November 1, 2012, MetLife received a copy of the second notice of an unfavorable decision from the Social Security Administration ("SSA") where the ALJ concluded:

> the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptom, however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. Her credibility, as regards her mental issues, is of concern to the [ALJ]. Although alleging mental issues particular[ly] involving her concentration and memory, she refuses to consider them within the mental health context because this is why her disability coverage through work was ended.

(D.I. 60 at 7); (D.I. 50-3 at 3476.) After exhausting MetLife's administrative process, Seeman initiated the present lawsuit with the court on April 19, 2012. (D.I. 1.) On July 30, 2013, the court denied MetLife's first motion for summary judgment and granted Seeman's. (D.I. 32.) The court, however, could not "conclude whether Seeman's physical diagnoses rendered her 'disabled' under the heightened post-June 3, 2010 standard" as found in the Plan and remanded the matter to MetLife "to evaluate whether Seeman remained disabled under the post-June 3, 2010, disability standard." (D.I. 32 at 20-21.) More specifically, the court stated that "more information is required about how Seeman's physical diagnoses affected her earning capacity." (D.I. 32 at 21.)

## A. Post-Remand Events

Following the court's July 30, 2013 Memorandum and Order, MetLife hired three Independent Physician Consultants ("IPCs") to conduct a "paper review" of Seeman's medical records. (D.I. 60 at 7.)[1] The post-remand IPCs include (1) Robert S. Friedman, M.D., board certified in anesthesiology and pain management, internal medicine, and rheumatology; (2) Jennifer Rooke, M.D., board certified in occupational medicine and general preventative medicine; and (3) Randy Rummler, M.D., board certified in adult psychiatry. (D.I. 60 at 10.) These IPCs did not meet with Seeman or physically examine her at any time. (D.I. 32.)

First, MetLife asked Dr. Friedman to consider whether Seeman was primarily disabled from CFS or FMS. (D.I. 60 at 10.) Dr. Friedman reviewed Seeman's medical records, spoke with Dr. Reinhardt and Dr. Diaz-Stanchi, and issued a report on March 4, 2015. (D.I. 60 at 10.) Dr. Friedman concluded that the "medical information provided does not support limitations due to [CFS] or [FMS]." (D.I. 60 at 10.) Dr. Friedman reasoned that "[u]nderlying psychiatric issues have significant impact on [FMS] and the perception of pain." (D.I. 60 at 10.) He also stated that he did not believe FMS is the primary issue and that as of March 3, 2011, "Dr. Snowden [a rheumatologist] believed that FMS was not associated with impairments that would prevent return to work." (D.I. 50-3 at 2743-44); (D.I. 60 at 10.)[2] Dr. Friedman, however, did not conduct any rheumatologic evaluation in his analysis and, instead, relied solely on the paper review and conversations with treating physicians. Dr. Friedman also noted that Seeman was using an elliptical machine five days a week when she was seen by Dr. Reinhardt on April 26, 2010. (D.I. 50-3 at 2743-44.) The report by Dr. Friedman was sent to Seeman's treating physicians. Dr. Diaz-

---

[1] A "paper review" is a disability determination based on a review of an individual's paper medical record without examining or meeting with them.

[2] The court finds it important to note that the ALJ mentions that Dr. Snowden "agreed that [Seeman] has chronic fatigue with elements of fibromyalgia and temporomandibular joint syndrome." (D.I. 50-3 at 3476.)

4

Stanchi provided updated restrictions and limitations, and Dr. Reinhardt responded with a letter dated April 1, 2015, stating that he disagreed with Dr. Friedman's report and that "Dr. Diaz-Stanchi has continued to state that Seeman is unable to return to work based upon the primary diagnosis of CFS and secondary diagnosis of FMS." (D.I. 60 at 11); (D.I. 50-3 at 2744.) Dr. Friedman, however, elected not to speak to Dr. Reinhardt about FMS or CFS because he "is not a Rheumatologist." Dr. Friedman could not get back in touch with Dr. Diaz-Stanchi to discuss his updated restrictions and limitations assessment. (D.I. 50-3 at 2744.)

Next, MetLife asked Dr. Jennifer Rooke, an Occupational Medicine IPC, to review Dr. Sheffield's files and answer (1) whether the medical information supported functional limitations (physical or psychiatric) beyond June 16, 2010; (2) to list the types of limitations; (3) to opine as to what specifically were the impairing diagnoses or conditions; and (4) to determine what side effects resulted from medications. Dr. Rooke concluded that Seeman did not have functional limitations due to any other physical condition or combination of physical conditions as of June 4, 2010. (D.I. 60 at 10.) According to the final termination letter, the Occupational Medicine IPC did not review Seeman's file for the conditions of fibromyalgia or CFS. (D.I. 50-3 at 2746.)

Finally, Dr. Rummler was asked to consider whether Seeman "had functional limitations as a result of schitzophrenia, bipolar disorder, dementia or organic brain disease, exclusions to the 24 month L[TD][]" benefits. (D.I. 60 at 10-11.) Dr. Rummler reviewed the administrative file and called Dr. Reinhardt before concluding that there "was no evidence of psychiatric diagnosis or treatment during the relevant time period." (D.I. 60 at 11.) Seeman agreed with Dr. Rummler's conclusions, had no comments on Dr. Rooke's, and disagreed with the conclusions of Dr. Friedman. (D.I. 60 at 11.) Dr. Friedman reviewed the additional documentation, issued a second report dated April 21, 2015, affirming his original conclusions and advising that the only treating

5

rheumatologist, Dr. Snowden, stated on July 31, 2009, that he did not believe Seeman has "any impairments related to fibromyalgia. In the absence of any subsequent Rheumatologic evaluations, it is difficult to determine what rheumatologic impairment, if any, currently exists." (D.I. 60 at 11.)

In addition to the three IPCs, at MetLife's request, Dr. Louise Sheffield, M.D., MPH, reviewed Seemans case. She was asked to opine on whether Seeman had functional limitations as a result of her condition. (D.I. 60 at 8.) Dr. Sheffield concluded that "the medical information supports physical function limitations beyond July 16, 2010[,]" and that Seeman's diagnosis "is fatigue associated with CFS and FMS." (D.I. 57 at 5.) Even though Dr. Sheffield did not ever meet or examine Seeman, she concluded that multiple providers agreed on the diagnosis. (D.I. 57 at 5-6.) At MetLife's request, Sheffield issued a report on January 7, 2014, in which she concluded that Seeman could:

> stand occasionally, walk occasionally (less than 1 hour per day) and sit frequently . . . climb steps less than one hour per day, bend and squat occasionally, twist less than one hour per day, reach frequently, light gripping and pinching frequently; firm gripping/pinching less than one hour per day; above shoulder reaching occasionally; and wr[i]te occasionally.

(D.I. 60 at 8.)

Around the same time, two Vocational Experts, Robert Pare and MetLife Employee Larcetta Linear, produced reports to provide insight into Seeman's background and employability. After meeting with Seeman for two hours, Pare provided MetLife with a twelve-page Employability Assessment with a detailed analysis of whether Seeman could perform her job based on her background, education, medical opinions. (D.I. 57 at 7.) He also provided a vocational history of Seeman's recent earnings. (D.I. 57 at 7.) The Pare Report explains that Seeman's job required her to be responsible for 9 managers and 201 people, and work more than forty hours per week. (D.I. 57 at 8.) Seeman's work also required that she assume physical postures that included

6

a combination of unplanned standing, walking, and sitting. (D.I. 57 at 8.) Pare found that no physician has medically determined that Seeman was able to resume working in her usual job or occupation. (D.I. 57 at 8.)

Lascetta Linear noted Seeman's seventeen and a half years as First Vice President/Unit Manager at Bank of America and determined that her position was comparable to that of a Manager for Credit and Collection. (D.I. 57 at 6.) Linear did not consider fatigue, loss of concentration, or other potential factors in presenting her findings. *Id.*

On April 18, 2014, MetLife issued a Termination of Benefits Letter and notified Seeman that she "[did] not satisfy the definition of disability set forth in the employer's Plan." (D.I. 60 at 9); (D.I. 57 at 6); (D.I. 50-3 at 560-69.) Specifically, MetLife found that "Seeman could earn more than 60% of her pre-disability earnings in an occupation that is comparable to her own reported occupation, taking into account her training, education, and experience." (D.I. 60 at 9.) MetLife concluded Seeman has the ability to work as a manager based on her "education, training, and experience[], considering her capabilities, restrictions, and limitations." *Id.* at 7. However, MetLife did not consider how Seeman's physical and cognitive limitations relating to the CFS and FMS affected her ability to function or perform the tasks of a Vice President/Manager. (D.I. 57 at 7.) On June 24, 2014, Seeman advised that she intended to appeal the decision and submitted additional medical records to MetLife. *Id.* In a letter dated June 10, 2015, MetLife affirmed its initial claim determination. (D.I. 60 at 11); (D.I. 50-3 at 2738-47.)

### B. MetLife's Final Termination Letter

On June 10, 2015, MetLife issued its Final Termination of Benefits Letter. (D.I. 57 at 12); (D.I. 50-3 at 2738-47.) The Letter states that Seeman (1) "has not demonstrated that she was unable to perform her own job and, therefore[,] any gainful occupation[] as of July 16, 2010, as a

7

result of any condition that is not a Mental or Nervous Disorder or Disease[;]" and (2) the medical information on file for Seeman's physical condition did not support her inability to perform any gainful occupation. (D.I. 50-3 at 2738); (D.I. 57 at 12.) Additionally, MetLife states in its Final Termination Letter that "[t]he medical documentation failed to support a finding of restrictions or limitations that would prevent [Seeman] from performing her own job, and therefore any gainful occupation, as of July 17, 2010[]" and, thus, termination of LTD benefits beyond July 16, 2010 was appropriate. (D.I. 50-3 at 2746.) MetLife relied on the statements by its three IPCs, particularly the statements of Dr. Friedman that Seeman does not suffer from CFS and FMS, and an Employability Assessment by Ms. Linear. (D.I. 60 at 18.) In its June 20, 2015 Final Termination of Benefits Letter (D.I. 50-3 at 2738-47), MetLife made the following observations regarding Seeman's medical history:

> (1) MetLife reviewed the entire file, including the medical records and opinions of medical professionals who treated Seeman (D.I. 50-3 at 2746);
>
> (2) Seeman's failed neuropsychological testing demonstrates she failed symptom validity testing (D.I. 60 at 19);
>
> (3) Mr. Pare's report was based upon Seeman's subjective complaints, which led Dr. Rooke and Dr. Rummler to conclude it was unsupported (D.I. 60 at 20); and
>
> (4) Results of both the [Independent Medical Examination ("IME")], neuropsychological testing and IPC reviews by seven additional independent physicians certified in multiple specialties confirm that to the extent Seeman was disabled, it was due to mental or nervous limitations and she already received benefits for such disabilities.

(D.I. 60 at 19-21.) MetLife's Final Termination Letter did not discuss the Pare Report or Linear's Employability Assessment. (D.I. 50-3.)[3] After receiving MetLife's Final Termination Letter,

---

[3] The Final Termination Letter only mentions the Pare Report to say that MetLife received it prior to its appeal review. (D.I. 50-3 at 2739.)

8

Seeman submitted additional documentation in support of her claim. Based upon the complete administrative filed, MetLife determined Seeman did not provide proof of physical disability as defined by the Plan. (D.I. 60.) For a second time, Seeman appealed the claim determination, which was upheld. (D.I. 60 at 2.) Subsequently, Seeman filed the present Motion for Summary Judgment with the court and MetLife filed its second Cross-Motion for Summary Judgment. (D.I. 55); (D.I. 59.)

## III. STANDARD OF REVIEW

### A. Summary Judgment Standard

Rule 56 provides "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are material, and disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Conopco, Inc.*, 527 F.3d at 165; *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). This standard remains the same where there are cross motions for summary judgment. *Lawrence v. City of Phila.*, 527 F.3d 299, 209 (3d Cir. 2008); *see also Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified . . . .").

9

## B. ERISA Standard

A plan participant or beneficiary is permitted by statute to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1332(a)(1)(B). The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where such discretionary authority is provided, the court reviews a benefits determination under an arbitrary and capricious standard. *See Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009); *Post v. Hartford Ins. Co.*, 501 F.3d 154, 160-62 (3d Cir. 2007). The court asks whether there exists "sufficient evidence for a reasonable person to agree with the decision," *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000), seeking to determine if the plan administrator abused its discretion in reaching its conclusion, *see Fisher v. Aetna Life Ins. Co.*, 890 F. Supp. 2d 473, 480-81 (D. Del. 2012); *Malin v. Metropolitan Life Ins. Co.*, 845 F. Supp. 2d 606, 611-12 (D. Del. 2012). Under this deferential standard of review, the court may overturn the administrator's decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (citations omitted).

When the plan administrator is burdened by a conflict of interest, the court will include that conflict as one of the many considerations informing its review. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 116-117 (2008). The Supreme Court has made clear that such a conflict exists where "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own

pocket." *Id.* at 108. "[A] conflict is merely one factor to be considered in evaluating whether [the] decision actually constituted an abuse of discretion." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 (3d Cir. 2010).

## IV. DISCUSSION

The court will apply the arbitrary and capricious standard of review as both parties agree that standard is appropriate.

Seeman makes two primary arguments in support of her position that MetLife abused its discretion in terminating her LTD benefits after the case was remanded: (1) there is a conflict of interest because MetLife both administers and pays out the LTD claims; and (2) that MetLife did not consider how Seeman's physical diagnoses impact her earning capacity. (D.I. 57 at 14-18.) The court will address each argument in turn.

### A. The Burden of Proof

Notwithstanding MetLife's argument to the contrary, the court previously determined that "the medical evidence drawn from the reports of the treating physicians suggested that Seeman was disabled as a result of certain physical conditions, including fibromyalgia and chronic fatigue syndrome, and it was *MetLife's burden* to demonstrate a factual basis for any conclusion to the contrary." (D.I. 32 at 13-14) (citing *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2003) ("[O]nce a claimant makes a prima facie showing of disability through physicians' reports . . . and if the insurer wishes to call into question the scientific basis of those reports . . . then the burden will lie with the insurer to support the basis of its objection."); *Blakely v. WSMW Indus., Inc.*, 2004 WL 1739717, at *10 (D. Del. July 20, 2004); (D.I. 60 at 15); (D.I. 57 at 18);

11

(D.I. 32 at 13.)[4] The court, thus, finds that the burden is on MetLife to show that Seeman is not entitled to LTD benefits.

## B. Conflict of Interest

"In deciding whether an administrator's conclusion is arbitrary and capricious, courts consider procedural and structural factors of the decision making process." *Patrick v. Reliance Standard Life Ins. Co.*, 2016 WL 4573877, at *9 (D. Del. Aug. 31, 2016), *report and recommendation adopted*, 2016 WL 5662138 (D. Del. Sept. 29, 2016), *aff'd*, 694 F. App'x 94 (3d Cir. 2017). Seeman argues MetLife's structural conflict of interest, coupled with procedural irregularities, establishes that MetLife's decisions were arbitrary and capricious. (D.I. 65 at 5-6.)

### 1. Structural Conflict of Interest

A structural conflict of interest arises when an insurer such as MetLife assumes the dual role of reviewing and paying claims under a benefits plan. *Dowling v. Pension Plan For Salaried Employees of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 245 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 1032 (2018). It is well settled that the court need not give such a conflict dispositive weight or even alter its standard of review. *Doroshow*, 574 F.3d at 233-24. Rather, the conflict functions as merely one factor considered in the court's abuse of discretion analysis. *Id.* at 234. The Third Circuit has explained that "walling off claims administrators" from those interested in finances may show the conflict is "less important." *Dowling*, 871 F.3d at 250 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). The reviewing court can give this factor more or less weight depending on the likelihood that the conflict actually affected the administrator's decision. *Glenn*,

---

[4] As the court pointed out in the Background Section of this Memorandum, in the Final Termination of Benefits Letter, MetLife states that Seeman "has not demonstrated that she was unable to perform her own job, and therefore any gainful occupation, as of July 17, 2010 as a result of any condition that is not a Mental or Nervous Disorder or Disease." (D.I. 50-3 at 2738.) This determination is inconsistent with the court's previous Memorandum and Order, which determined Seeman met her initial burden of proof. (D.I. 32.)

12

554 U.S. at 117; *see Dowling*, 871 F.3d at 250. Thus, while the conflict of interest does not alter the standard of review, it constitutes a factor that a court must evaluate and then consider in its decision. *See Smith v. Automatic Data Processing, Inc.*, 931 F. Supp. 2d 623, 627 (D. Del. 2013).

In this case, the structural conflict of interest is neutral to the court's ultimate analysis. The court knows very little about MetLife's conflict. Indeed, a conflict does exists—MetLife both funds and administers the plan—but that is about all the court knows. (D.I. 57 at 16-17, 19.) Seeman has failed to address any evidence suggesting MetLife has a negative history of failing to properly exercise its fiduciary responsibilities. (D.I. 60 at 14.) For its part, MetLife has only provided some evidence that it took steps to reduce potential biases by, for example, keeping its finances separate from its claims. (D.I. 60 at 14, 18.) Without more, the court cannot determine whether the structural conflict played a role in the final claim determination. Thus, this factor bears little weight in the court's analysis.

### 2. Procedural Conflict of Interest

"The procedural inquiry focuses on how the claimant was treated by the administrator." *Patrick*, 2016 WL 4573877, at *10 (citing *Post*, 501 F.3d at 162, 165, *overruled on other grounds by Doroshow*, 574 F.3d at 230). When procedural irregularities are minor or few in number, the court will not closely scrutinize them. *Id.* In this case, Seeman alleges six procedural irregularities including: (1) a disregard of opinions previously relied upon; (2) a self-serving selectivity in the use of evidence or self-serving paper reviews of medical files; (3) a reliance on the opinions of non-treating physicians over treating physicians without explanation; (4) failure to comply with notice requirements; (5) failure to analyze all relevant diagnoses; and (6) failure to consider Seeman's ability to perform actual job requirements. (D.I. 65 at 5.)[5]

---

[5] The court notes that Seeman did not elaborate on all of the asserted conflicts. The court will, therefore, address only those for which Seeman has made clear arguments. Additionally, the parties conflate the arbitrary and

13

## C. Termination of Long-Term Disability Benefits was Arbitrary & Capricious

Next, Seeman contends that MetLife failed to focus on her CFS and FMS related symptoms and how those symptoms affected her earning capacity. (D.I. 57 at 18.) In contrast, MetLife asserts the termination of benefits decision was not arbitrary and capricious because it considered all medical evidence, and that evidence did not support the conclusions of her treating physicians that she was disabled as the result of CFS and FMS. (D.I. 60 at 20.) The court does not agree.

### 1. MetLife Failed to Address How Seeman's Physical Diagnoses Impact her Earning Capacity

The court directed MetLife to consider how Seeman's physical diagnoses affected her *earning* capacity. (D.I. 32 at 21.) Seeman points out that in addition to failing to consider her physical and job performance limitations, MetLIfe (1) selectively used the medical record; and (2) selectively used the vocational reports. (D.I. 57 at 14 n.18.) MetLife, however, claims that it properly considered all of Seeman's medical records in order to make its final determination. (D.I. 60 at 10 n.14.)

#### *a. Selective Use of Vocational Reports & Medical Record*

When applying the arbitrary and capricious standard, the Third Circuit directs an examination of whether the fiduciary was self-serving in its consideration of the evidence. *Hession v. Prudential Ins. Co. of Am.*, 307 F. App'x 650, 653 (3d Cir. 2008). Seeman asserts that MetLife gives more weight to the paper review of its IPCs who, in some instances, did not have her full medical record. (D.I. 57 at 17-18.) Specifically, Seeman argues MetLife did not properly weigh

---

capricious and procedural conflict analyses. The court recognizes the procedural conflict of interest factor in of itself is not dispositive, however, given this conflation, for the sake of brevity, the court will only address those arguments once, in the arbitrary and capricious analysis section.

14

the vocational expert reports produced by Robert Pare and Larcetta Linear. MetLife asserts, however, that (1) the record does not support Pare's conclusions because they were based upon Seeman's *subjective* complaints; and (2) requesting objective evidence of *symptoms* is reasonable. (D.I. 60 at 19-20);[6] *Nichols v. Verizon Commc'ns, Inc.*, 78 F. App'x 209, 212 (3d Cir. 2003).[7]

Evidence of physical ailments' impact on the job requirements *must* be considered. *Ricca v. Prudential Ins. Co. of Am.*, 747 F. Supp. 2d 438, 445 (E.D. Pa. 2010).[8] Because MetLife did not provide her with Seeman's full medical records, Linear's report did not address Seeman's vocational deficits nor did it explain whether Seeman could work at her previous level. (D.I. 57 at 8, 18.) While Linear determined Seeman should *not* be entitled to LTD benefits, Dr. Sheffield, who MetLife hired to conduct a paper review of Seeman's files, explained that the medical record supports fatigue as the impairing diagnosis, and she described the functional limitations as "*objective* assessments." (D.I. 50-3 at 3013.) Similarly, the Pare Report considered in detail the physical and cognitive requirements of Seeman's job. Pare compared Seeman's current cognitive level to the level needed to function in her previous position as Vice President of a Financial Institution in determining Seeman is unemployable. Importantly, and in contrast to MetLife's

---

[6] MetLife argues Dr. Rooke considered Pare's vocational opinion and determined that Pare's conclusions were not supported by a review of the medical information. (D.I. 60 at 10 n14.) It is perhaps worth noting that Dr. Rooke, did not consider disability related to FMS and CFS. (D.I. 53-3 at 2744); (D.I. 60 at 10.)

[7] The court believes MetLife incorrectly cites to *Nichols* in its brief as "78 F. App'x 2009, 2012 (3d Cir. 2003)." (D.I. 60 at 17, 19.) The Court of Appeals in *Nichols* recognized that objective evidence should not be required for CFS and FMS, and that the Plan administrator in that case, MetLife, based its denial of benefits on a number of factors, "including the lack of objective tests demonstrating the existence of her symptoms, something that a claimant with CFS might reasonably be asked to provide." *Nichols*, 78 Fed. App'x at 212. In contrast to *Nichols*, Seeman has presented objective evidence of symptoms, which include, among others, pain and fatigue. *See infra* note 11.

[8] "Administrators of ERISA plans are not required to defer to the opinions of a participant's treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *Ricca*, 747 F. Supp. 2d at 444–45 (citing *Nord*, 538 U.S. at 831); *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 127–31 (3d Cir. 2000) (an administrator's denial of benefits was not arbitrary and capricious where based on the conclusions of its health care workers and physicians, one of whom conducted an independent medical examination of the claimant, despite the opinion of claimant's treating physician that claimant was totally disabled). Nonetheless, administrators "may *not* arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834.

current position, both parties previously agreed Seeman is *unemployable* regardless of whether it is from a medical or mental perspective. (D.I. 50-3 at 3014-16.) The Pare Report explains that:

> [t]here has *never* been a question as in the presenting symptoms and diagnoses of the Evaluee, but a question remains about its psychiatric or medical origin. Apparently, as such, Ms. Linear was given parameters by which to contain her development of a vocational opinion and as we know, she was limited to the report of Dr. Sheffield.

(D.I. 50-3 at 3014.)

Instead of relying on the opinions of Dr. Sheffield, Pare, and Linear, MetLife relied on paper reviews by three IPCs who were instructed that Seeman "exhausted her appeal rights for CFS [and] FMS[.]" (D.I. 50-3 at 2956); (D.I. 57 at 9.) Specifically, to support its finding that Seeman's primary condition is *not* CFS, MetLife heavily relies on the Rheumatology IPC, Robert S. Friedman, MD. (D.I. 57 at 10); (D.I. 50-3 at 2743.) Dr. Friedman states that after a conversation with Dr. Reinhardt and a review of the records "CFS has not played a substantial role in [Seeman's] illness." (D.I. 50-3 at 2743.) Specifically, Dr. Friedman states that when [Seeman] was seen by Dr. Reinhardt on April 26, 2010, it was noted she was using an elliptical trainer five days a week[]" and that "fatigue *could* be associated with sleep disorders [such as Restless Leg Syndrome ("RLS")], which exacerbate fibromyalgia." (D.I. 50-3 at 2743.) The court finds two problems with Dr. Friedman's assessment. First, after reviewing Dr. Friedman's conclusions, Dr. Reinhardt states that "[he] is not aware of any licensed physician who has treated Ms. Seeman since [he] diagnosed her with CFS in August, 2008 who *has not agreed* with [his] impression that her primary condition was CFS." (D.I. 50-3 at 2766); (D.I. 57 at 10); *Hunter v. Federal Express Corp.*, 2004 WL 1588229 at *11 n.17 (E.D. Pa. July 15, 2006)("the opinions of physicians who examine a patient are inherently more reliable then the opinions of those who do not."), *rev'd on other*

16

*grounds*, 169 Fed. App'x 697 (3d Cir. 2006).[9] It, thus, appears that Dr. Friedman mischaracterizes Dr. Reinhardt's opinion. (D.I. 50-3 at 2743.)[10] Second, the termination letter explains that Dr. Friedman determined that "in the absence of any subsequent rheumatologic evaluations, it is difficult to determine what rheumatologic impairment, if any, currently existed." (D.I. 50-3 at 2745.) The court previously explained that CFS and FMS "cannot be established via objective tests[]" and "it is an abuse of discretion for a plan administrator to demand objective tests establishing the existence of a condition for which there [are] no such tests." (D.I. 32 at 15, n.10)(citing *Fisher*, 890 F. Supp. 2d at 483). It appears that this is exactly the evidence Dr. Friedman would require to find Seeman disabled. Nevertheless, Seeman provided evidence of CFS and FMS symptoms including pain at "trigger points," fatigue, and the inability to walk, stand, or sit comfortably for an extended period of time. (D.I. 57 at 11, 14.)[11]

### b. *The Social Security Administration Record is Insubstantial*

The court believes it is important to briefly note that, among other evidence, MetLife's Final Termination Letter relies in-part on the ALJ's July 10, 2010 opinion rejecting Seeman's claim for Social Security Disability Income ("SSDI") benefits. (D.I. 50-3 at 2745); (D.I. 65 at 10.) The court

---

[9] In similar instances, other courts have determined that heavy reliance on paper reviews is not enough to support a denial of benefits. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 906 (9th Cir. 2016); *Schwarzwaelder v. Merrill Lynch & Co.*, 606 F. Supp. 2d 546, 557 (W.D. Pa. 2009); *Evans v. Unum Provident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006)(While a "paper review" is permissible under ERISA, the failure to conduct a physical examination "may raise questions about the thoroughness and accuracy of the benefits determination.").

[10] It appears that Friedman's opinion that CFS cannot be a diagnosis is related to Dr. Diaz-Stanchi agreeing with Friedman that, "restless leg syndrome would be worsened from daily use of Adderall." However, Dr. Diaz-Stanchi stated that she does not think Seeman had a substance use disorder related to the Adderall because Seeman's thirty day prescription lasted longer than prescribed (about six weeks). More important, Friedman does not provide an explanation as to how RLS, as compared to CFS and FMS, could cause the high level of fatigue which Seeman experiences. (D.I. 50-3 at 2742-44.)

[11] The court's previous memorandum (D.I. 32) explained that the record indicates that there were objective indicia of CFS and FMS relating to the testing by Seeman's physical therapist Ken Dill, (D.I. 50-3 at 2764, 3321, 3392), and the finding of trigger/tender points by Plaintiff's treating physicians. (D.I. 50-1 at 665, 667, 669, 672, 674, 676, 678, 680, 682, 684-85); (D.I. 50-3 at 2763, 3028, 3030, 3321). Indeed, Dr. Diaz-Stanchi notes "objective signs" on April 9, 2015. These were not included in Dr. Friedman's supplemental report of April 21, 2015 or in MetLife's June 10, 2015 Final Termination Letter. (D.I. 50-3 at 2738-47, 2753); (D.I. 65 at 14 n.20.)

does not believe the ALJ's opinion is sufficient to rescue MetLife's appeal determination. As an initial matter, while the consistency of a plan administrator's decision with a SSDI finding can function as one factor in the abuse of discretion analysis, it certainly is not dispositive. *Fisher*, 890 F. Supp. 2d at 483 (citing *Glenn*, 554 U.S. at 118–19); *see Russell v. Paul Revere Life Ins. Co.*, 148 F. Supp. 2d 392, 409 (D. Del. 2001); *see also Edgerton v. CNA Ins. Co.*, 215 F. Supp. 2d 541, 549 (E.D. Pa. 2002). Not only are different standards applicable in each context, *see Nord*, 538 U.S. at 832-33, but the plan administrator may be aware of facts unavailable to the ALJ. *See Goletz v. Prudential Ins. Co. of Am.*, 383 F. App'x 193, 198 (3d Cir. 2010); (D.I. 65 at 10); (D.I. 50-3 at 2745.)[12] In its Final Termination Letter, MetLife explained that its "[IPCs] considered the [ALJ]'s Opinion and Decision" even though "the majority of the medical evidence considered by the SSA" was prior to "the time period under review." (D.I. 50-3 at 2745); (D.I. 32.)[13] Here, for example, Dr. Pare's report was prepared after the ALJ issued his opinion and Dr. Reinhardt responded to Dr. Friedman's report with concerns on April 1, 2015. (D.I. 65 at 19); (D.I. 50-3 at 2755-66.) For these reasons, even though MetLife relied, in part, on the ALJ determination, the court cannot conclude that this lone administrative ruling outweighs the numerous indications of MetLife's arbitrary and capricious decision making.

Because the court cannot find that the evidence weighs against granting Seeman LTD benefits, the court will grant Seeman's Motion for Summary Judgement (D.I. 55) and deny MetLife's Cross Motion for Summary Judgment. (D.I. 59.)

---

[12] For example, the Plan does not consider age as a relevant factor, while the SSA does. (D.I. 65 at 10.) The SSA ALJ's opinion is dated July 10, 2010 when Seeman was 52 years old. *Id.* The SSA considers persons of advanced age to be 55 years and older. *Id.*

[13] The court believes it important to note that the ALJ concurred with the vocational expert that Seeman "would be unable to perform the duties of the jobs cited." (D.I. 50-3 at 3481.) Though the court ascribes little weight to the ALJ's decision, the court believes it is important to read the Opinion entirely to properly understand the context of the ALJ's decision. (D.I. 50-3 at 3468-88.)

**D. Attorneys' Fees**

A prevailing party is entitled to reasonable attorneys' fees and costs associated with an action arising out of a defendant failing to pay required contributions. *See* 29 U.S.C. § 1132(g)(2)(D); *United Auto. Workers Local 259 Social Sec. Dept. v. Metro Auto Center*, 501 F.3d 283, 285 (3d Cir. 2007). Award of attorney fees to prevailing party under ERISA is discretionary. *Schake v. Colt Indus. Operating Corp. Severance Plan for Salaried Employees*, 960 F.2d 1187, 1192 (3d Cir. 1992); *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255, 130 S. Ct. 2149, 2158, 176 L. Ed. 2d 998 (2010). In deciding whether to award attorneys' fees, the Court of Appeals for the Third Circuit has stated that a district court *must* consider:

> (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorney's fees; (3) the deterrent effect of an award of attorney's fees; (4) the benefit conferred upon members of the pension plan as a whole; and (5) the relative merits of the parties' positions. *Ursic*, 719 F.2d at 673 (3d Cir. 1983). "Our case law makes clear that . . . the amount of a fee award is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 329 (3d Cir. 2011) (*en banc*).

*Templin v. Indep. Blue Cross*, 785 F.3d 861, 867 (3d Cir. 2015)(citing *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983)). While Seeman maintains that she is entitled to attorneys' fees under 29 U.S.C. § 1132(g)(1), as MetLife points out Seeman's motion is unsupported. (D.I. 60 at 20 n.28.)[14]

---

[14] Seeman's brief makes no argument for an award of attorneys' fees and simply states in full that:
> 29 U.S.C. § 1132(g)(1) permits "the court in its discretion to allow a reasonable attorney's fee and costs of action to either party in any action brought pursuant to subchapter I of ERISA." *Hamilton v. Bank of New York*, 1995 WL 447659 at *3 (D. Del. July 18, 1995)(J. Schwartz). This case merits such a determination. Plaintiff should receive interest on the delayed payment of the ERISA benefits due to him. *Skretvedt* [], 372 F.3d [at] 195-96 []. If this Court rules in Plaintiff's favor, then his counsel will file for the Court's review a Petition for Attorneys' Fees and Costs, along with pre- and post- judgment interest.

(D.I. 57 at 20.)

19

### E. Pre-Judgment and Post-Judgment Interest

Seeman also requests pre-judgment and post-judgment interest for the "delayed payment of the ERISA benefits." (D.I. 55 at 20.) In the ERISA context, "in the absence of an explicit statutory command otherwise, district courts have broad discretion to award prejudgment interest." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 205-06 (3d Cir. 2004); *Schake*, 960 F.2d at 1190, 1192 n.4 (where a judgment has been entered in favor of a prevailing ERISA plaintiff, "[i]t is undisputed that prejudgment interest typically is granted to make a plaintiff whole because the defendant may wrongly benefit from use of plaintiff's money," subject to the District Court's applying "the appropriate standards in granting prejudgment interest"); *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3d Cir. 1992) (noting that prejudgment interest is available despite ERISA's silence). The court will, thus, award Seeman the applicable pre-judgment interest.

Next, 28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." *Skretvedt*, 372 F.3d at 216. Here, post-judgment interest will continue to run at the rate charged by the Internal Revenue Service from the date of the judgment until paid. *Serv. Employees Int'l Union Local 32BJ Dist. 36 v. ShamrockClean Inc.*, 2018 WL 1124270, at *2 (E.D. Pa. Feb. 26, 2018)(awarding post-judgment interest). Accordingly, the court will grant the post-judgment interest at the applicable statutory rate.

### V. CONCLUSION

The court finds that MetLife's findings were not supported by substantial evidence. Thus, the court will grant the Seeman's Motion for Summary Judgment, and deny MetLife's Cross-Motion for Summary Judgment.

Dated: July 9, 2018

UNITED STATES DISTRICT JUDGE